Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel: (213) 785-2610
Fax: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff Yunfeng Zou*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YUNFENG ZOU, derivatively on behalf of UPSTART HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> DAVID GIROUARD, PAUL GU, SANJAY DATTA, CHANTAL RAPPORT, PETER BERNARD, KERRY COOPER, MARY HENTGES, JEFF HUBER, CIARAN O'KELLY, and HILLIARD TERRY, III, <br><br> Defendants, <br><br> and <br><br> UPSTART HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

1

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Yunleng Zou ("Plaintiff"), by and through the undersigned attorneys, derivatively and on behalf of Nominal Defendant Upstart Holdings, Inc. ("Upstart" or the "Company"), files this Verified Shareholder Derivative Complaint against certain current and/or former officers and directors of Upstart for breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and, as to Defendants David Girouard, Paul Gu, Sanjay Datta, and Chantal Rapport, contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, a review of Upstart's public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Upstart, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain current and/or former officers and directors of Upstart between May 14, 2025 through November 4, 2025, both dates inclusive (the "Relevant Period").

2. Upstart built an artificial intelligence ("AI") software to accurately identify prospective loan borrowers' creditworthiness and optimize the loan process

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for lenders and lendees. Purportedly, Upstart's AI models can better identify the true risk of a loan, which the Company refers to as "risk separation." According to the Company, this allows it to simultaneously grant more loans and reduce defaults than traditional underwriters.

3.     In addition to the traditional information such as FICO score and income, Upstart's AI software uses unconventional metrics to assess default risk, including, among other things: where a potential borrower attended college, their GPA, their standardized test scores, and their work history.

4.     The Company's AI software is occasionally recalibrated to help improve the accuracy and automation of its approvals.

5.     In early 2025, Upstart launched its newest version of its AI model, Model 22. At the time of its launch, the Individual Defendants (defined below) touted that Model 22's accuracy rates would increase loan approval rates and, in turn, bolster the Company's revenue.

6.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Upstart, willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Model 22 would overreact to negative macroeconomic flags in performing its risk-separation evaluation; (2) as a result, Model 22's accuracy and loan approval rate was overstated; (3) as a result of Model 22's conservative credit assessment, Upstart's revenue results were being negatively impacted; (4) therefore, the Company's revenue guidance for 2025 was unreliable; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

3

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

7. The truth fully emerged on November 4, 2025, when the Company issued a press release announcing its financial results for the third quarter of 2024, which revealed that the Company had missed its revenue guidance by approximately $2.62 million and that the Company was reducing its revenue guidance from approximately $1.055 billion down to $1.035 billion, and its revenue from fees guidance from $990 million down to $946 million.

8. On an earnings call with investors and analysts that same day, it was revealed that the reason for the negative results was Model 22 reducing borrower approvals because it was "overreacting" to various macroeconomic signals during the third quarter.

9. On this news, the price of the Company's stock fell $4.49 per share, or about 9.7%, from a close of $46.24 per share on November 4, 2025, to close at $41.75 per share on November 5, 2025.

10. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11. The Individual Defendants' misconduct has subjected the Company and several of the Company's officers to a federal securities fraud class action pending in the United States District Court for the Northern District of California captioned *Dunn v. Upstart Holdings, Inc. et al.*, No. 3:26-cv-02974 (the "Securities Class Action"). As a result, Upstart will have to expend many millions of dollars.

12. Further, the Individual Defendant's misconduct has subjected the Company to the need to undertake internal investigations and implement adequate internal controls and to suffer losses from the waste of corporate assets and the unjust enrichment of the Individual Defendants.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

13. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and certain Individual Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

16. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

5

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

18.     Plaintiff is, and has been at all relevant times, a shareholder of Upstart.

19.     Nominal Defendant Upstart is a Delaware corporation with its principal executive offices at 2950 S. Delaware Street, Suite 410, San Mateo, California 94403. Upstart's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "UPST."

20.     Defendant David Girouard ("Girouard") co-founded Upstart and has served as a Company director and Executive Chairman since 2012. Defendant Girouard previously served as the Company's Chief Executive Officer ("CEO") from 2012 until May 1, 2026.

21.     Defendant Paul Gu ("Gu") co-founded Upstart and has served as a Company director since 2015. Defendant Gu has served in various roles at the Company since 2012, including Chief Technology Officer. As of May 1, 2026, Defendant Gu is the Company's CEO.

22.     Defendant Sanjay Datta ("Datta") has served as Upstart's President, Capital & Enterprise, since February 2026. Defendant Datta previously served as the Company's Chief Financial Officer ("CFO") from 2016 until March 2026.

23.     Defendant Chantal Rapport ("Rapport") has served as Upstart's Chief Marketing Officer ("CMO"), Senior Vice President of Growth since 2021. Defendant Rapport has previously served various other roles at the Company since 2017, including as Vice President of Growth from 2021 until 2021.

24.     Defendant Peter Bernard ("Bernard") has served as a Company director since February 2025. Defendant Bernard also serves as a member of the Nominating & Corporate Governance Committee and the Compensation Committee.

6

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

25. Defendant Kerry Cooper ("Cooper") has served as a Company Director since 2021. Defendant Cooper also serves as the Lead Independent Director and as the Chair of the Compensation Committee.

26. Defendant Mary Hentges ("Hentges") has served as a Company director since 2019. Defendant Hentges also serves as a member of the Audit Committee.

27. Defendant Jeff Huber ("Huber") served as a Company director from 2021 until May 2026. Defendant Huber also served as a member of the Nominating & Corporate Governance Committee.

28. Defendant Ciaran O'Kelly ("O'Kelly") has served as a Company director since 2018. Defendant O'Kelly also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

29. Defendant Hilliard Terry, III ("Terry") has served as a Company director since 2019. Defendant Terry also serves as the Chair of the Audit Committee.

30. Defendants Girouard, Gu, Datta, Rapport, Bernard, Cooper, Hentges, Huber, O'Kelly, and Terry are collectively referred to herein as the "Individual Defendants."

31. The Individual Defendants, together with Upstart, are herein referred to as "Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

32. By reason of their positions as officers, directors, and/or fiduciaries of Upstart and because of their ability to control the business and corporate affairs of Upstart, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are

7

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

33.     Each director and officer of the Company owes to Upstart and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

36.     To discharge their duties, the officers and directors of Upstart were

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, as well as pursuant to the Company's own Code of Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Upstart conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith and take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Upstart and the procedures for the reporting of the business and internal affairs to the Board and to periodically investigation, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement adequate and functioning legal, financial, and management controls, such that Upstart's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's

9

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefitting themselves or other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

37.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Upstart and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. These duties require a refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

38.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.     The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

40. The Individual Defendants were the agents of each other and of Upstart at all relevant times and were acting within the course and scope of such agency.

41. Because of their advisory, executive, managerial, directorial, and controlling positions within Upstart, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

42. The Individual Defendants were able to, and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Upstart.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

43. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

45. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Upstart was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

47.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Upstart and was, at all times, acting within the course and scope of such agency.

## UPSTARTS'S CODE OF ETHICS

48.    Upstart's Code of Ethics states that the Company is "committed to maintaining the highest standards of ethical conduct." The Code of Ethics also notes that it "applies to all directors, officers and employees (who, unless otherwise specified, will be referred to jointly as '**employees**') of Upstart Holdings, Inc. or its subsidiaries." (emphasis in original).

49.    The section of the Code of Ethics titled "Code of Ethics" states, in relevant part:

12

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

A "conflict of interest" may exist whenever the private interests of a Covered Individual[1] conflict in any way (or even appear to conflict) with the interests of the Company. While Covered Individuals should be free to make personal investments and enjoy social relations and normal business courtesies, they must not have any personal interests that adversely influence the performance of their job responsibilities. A conflict situation can arise when a Covered Individual takes actions or has interests that may make it difficult to perform his or her Company work objectively. Conflicts of interest may also arise when a Covered Individual, or a member of his or her family, receives improper personal benefits as a result of his or her position in the Company, whether received from the Company or a third party.

50.    The section of the Code of Ethics titled "Protection of Assets, Confidentiality, and Communications" states, in relevant part:

All Covered Individuals should endeavor to protect the Company's assets and ensure their efficient use. Any suspected incident of fraud or theft should be reported immediately to their manager or the Responsible Officer for investigation.

In carrying out the Company's business, Covered Individuals may learn confidential or proprietary information about the Company, its customers, suppliers or business partners. Confidential or proprietary information of the Company, and of other companies, includes, but is not limited to, any nonpublic information that would be harmful to the relevant company or useful to competitors if disclosed.

51.    The section of the Code of Ethics titled "Compliance With Laws, Rules and Regulations" states, in relevant part:

All Covered Individuals must respect and obey all laws when carrying out responsibilities on behalf of the Company and refrain from illegal conduct. Covered Individuals have an obligation to be knowledgeable

---

[1] "Covered Individuals" includes "every Upstart employee, contingent worker, and consultant" per the Code of Ethics.

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

about specific laws, rules and regulations that apply to their areas of responsibility. If a law conflicts with a policy in this Code, employees must comply with the law. Any questions as to the applicability of any law should be directed to the Responsible Officer.

The following is a brief summary of certain topics about which Covered Individuals should be aware:

* * *

D. Insider Trading. Under federal and state securities laws, it is illegal to trade in the securities of a company while aware of material nonpublic information about that company. Because Covered Individuals may have knowledge of specific confidential information that is not disclosed outside the Company which will constitute material nonpublic information, trading in the Company's securities or in the securities of those companies with which the Company does business by employees or persons employees provide material nonpublic information to could constitute insider trading, violating the law. It is a Covered Individual's responsibility to comply with these laws and not to share material nonpublic information. Please see the Company's Insider Trading Policy for more information about our policies and procedures relating to insider trading.

E. Federal Consumer Protection & Laws that Apply to our Business. Federal and state governments have enacted laws and regulations applicable to the Company's business, including laws and regulations designed to protect consumers, anti-money laundering laws, and to otherwise regulate extensions of credit to consumers and others. You should review the Upstart Compliance Binder that provides all the policies the Company has implemented to comply with these laws in the operation of its business.

52.    The section of the Code of Ethics titled "Keeping the Audit Committee Informed" states:

14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The Audit Committee plays an important role in ensuring the integrity of the Company's public reports. If a Covered Individual believes that questionable accounting or auditing conduct or practices have occurred or are occurring, they should notify the Audit Committee of the Board. In particular, any Covered Individual should promptly bring to the attention of the Audit Committee any information of which they may become aware concerning:

a. the accuracy of material disclosures made by the Company in its public filings;
b. material weaknesses or significant deficiencies in internal control over financial reporting;
c. any evidence of fraud that involves a Covered Individuals who has a significant role in the Company's financial reporting, disclosures or internal controls or procedures; or
d. any evidence of a material violation of the policies in this Code regarding financial reporting.

53.    The section of the Code of Ethics titled "Maintaining and Managing Records" states the following, in relevant part:

The Company is required by local, state, federal, foreign and other applicable laws, rules and regulations to retain certain records and to follow specific guidelines in managing its records. Records include all recorded information, regardless of medium or characteristics. Civil and criminal penalties for failure to comply with such guidelines can be severe for Covered Individuals and the Company.

Additionally, please note that all Company-issued devices, computers, hardware, cell phones, media, documents, records and information are the property of the Company. As such, the Company requires Covered Individuals to cooperate with any request made by the Responsible Officer to preserve or produce any documents, records, information, devices, computers, hardware, cell phones or other media. Covered Individuals should consult with the Responsible Officer regarding the retention of records in the case of an actual or threatened litigation or government investigation.

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

54. The section of the Code of Ethics titled "Reporting and Other Records" states:

As a financial services company, it is of critical importance that the Company's reporting to the various regulators with oversight over our business, and to our partners, be full, fair, accurate, timely and understandable. Depending on their respective positions with the Company, Covered Individuals may be called upon to provide information necessary to assure that the Company's reporting meets these requirements. The Company expects Covered Individuals to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's reporting requirements.

Covered Individuals are responsible for the accurate and complete reporting of financial information within their respective areas and for the timely notification to senior management of financial and non-financial information that may be material to the Company to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with government agencies or releases to the general public.

Each Covered Individual involved in the Company's disclosure process must familiarize themselves with the disclosure requirements applicable to the Company and the business and financial operations of the Company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and selfregulatory organizations.

Covered Individuals must maintain all of the Company's books, records, accounts and financial statements in reasonable detail, and reflect the matters to which they relate accurately, fairly and completely. Furthermore, they must ensure that all books, records, accounts and financial statements conform both to applicable legal requirements and to the Company's accounting policies and system of internal controls. They must carefully and properly account for all assets of the Company. They may not establish any undisclosed or

16

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

unrecorded account or fund for any purpose. They shall not make any false or misleading entries in the Company's books or records for any reason, or disburse any corporate funds or other corporate property without adequate supporting documentation and authorization. They shall not misclassify transactions related to accounts, business units or accounting periods. Each Covered Individual bears responsibility for ensuring that they are not party to a false or misleading accounting entry.

55.    The section of the Code of Ethics titled "Compliance, Reporting and Investigations" states, in relevant part:

Reporting Violations. If a Covered Individual knows of or suspects a violation of this Code (including violations of applicable laws and regulations or complaints or concerns about accounting, internal accounting controls or auditing matters), or has concerns about a situation that they believe does not reflect the Company's culture and values, they must report it immediately to their manager, the Responsible Officer or the Chief People Officer. **Individuals may also report concerns anonymously at www.lighthouseservices. com/upstart** (see the **Upstart Whistleblower Policy).**

All reports will be kept confidential, to the extent practical, except where disclosure is required to investigate a report or mandated by law. The Company does not permit retaliation of any kind for good faith reports of violations or possible violations.

(Emphasis in original).

56.    The section of the Code of Ethics titled "Amendment, Modification and Waivers" states:

The Company reserves the right to amend this Code at any time, for any reason, subject to applicable laws, rules and regulations. Any amendment, modification or waiver of the provisions of this Code must be approved in writing by the Board or, if appropriate, its delegate(s) and promptly disclosed pursuant to applicable laws and regulations. Any waiver or modification of this Code for the principal

17

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

executive officer, principal financial officer, principal accounting officer, controller, or any other persons performing similar functions in the Company will be promptly disclosed to stockholders if and as required by applicable law or the rules of the stock exchange on which the securities of the Company are listed.

## UPSTART'S AUDIT COMMITTEE CHARTER

57. Upstart also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee is to assist the Board in its oversight of:

1. the accounting and financial reporting processes and internal controls of the Company;

2. the audit and integrity of the Company's financial statements;

3. the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements);

4. the qualifications, independence and performance of the Company's independent auditors;

5. the design, implementation and performance of the Company's internal audit function, as applicable; and

6. the design, implementation and performance of the Company's risk management functions (including Compliance, Enterprise Risk Management, Fraud/Anti-Money Laundering, Model and Fair Lending Risk, Information Security, Privacy and Data Governance, and Third Party Risk Management).

The Committee shall also be responsible for preparing the report required by the Securities and Exchange Commission (the "SEC") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing other duties and responsibilities as are enumerated in or consistent with this charter.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The function of the Committee is primarily one of oversight. The Company's management is responsible for preparing the Company's financial statements, and the independent auditor is responsible for auditing and reviewing those financial statements. The Committee is responsible for assisting the Board in overseeing the conduct of these activities by management and the independent auditor. The Committee is not responsible for providing any expert or special assurance as to the financial statements or other financial information provided by the Company to its stockholders or others or as to the independent auditor's work.

58.    In a section titled "Responsibilities," the Audit Committee Charter states:

The following are the principal recurring responsibilities of the Committee. The Committee may perform other functions that are consistent with its purpose and applicable law, rules and regulations, and as the Board or Committee deem appropriate. In carrying out its responsibilities, the Committee believes its policies and procedures should remain flexible, in order to best react to changing conditions and circumstances.

59.    In the same section, under the subsection "Review of Internal Controls and Integrity of Financial Statements," the Audit Committee Charter states:

The Committee shall meet with management, the internal audit function and the Company's independent auditor to review and discuss the Company's internal controls and the integrity of the Company's financial statements. Included in this process shall be review of:

a. the scope and timing of the annual audit of the Company's financial statements;

b. the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations"; and the Committee shall make a recommendation to the Board as to whether

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K for filing with the SEC;

c. the results of the independent audit and the independent auditor's opinion on the audited financial statements prior to the filing of the Form 10-K, and the results of the quarterly review prior to the filing of each Form 10-Q;

d. the Company's internal controls report and the independent auditor's attestation report, prior to the filing of the Form 10-K;

e. the quality and adequacy of the Company's internal controls, and discussion with management, the head of internal audit, and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;

f. the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief Executive Officer and Chief Financial Officer;

g. any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

h. any major issues regarding account principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles to be applied in respect of significant new transactions or other significant events not in the ordinary course of the Company's business;

i. any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including critical accounting policies and practices to be used and analyses of the effects of alternative GAAP methods on the financial statements;

20

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

j. any other material written communications between the independent auditor and management, including, but not limited to, the management letter and schedule of unadjusted differences;

k. the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company;

l. any audit problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management; and

m. any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

Among the items the Committee shall review with the independent auditor are: accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise); any communications between the audit team and the audit firm's national office regarding auditing or accounting issues presented by the engagement; and any "management" or "internal control" letters issued, or proposed to be issued, by the independent auditor. Among the items the Committee shall review with the head of internal audit are: the responsibilities, budget and staffing of the Company's internal audit function. The Committee shall also review and assess the annual internal audit plan, the process used to develop the plan, and the status of activities, significant findings, recommendations and management's response.

60.    In the same section, under the subsection "Internal Audit," the Audit Committee Charter states that the Audit Committee will:

- Review the appointment and replacement (if applicable) of the leader of the internal audit function.

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Review the significant reports to management prepared by the internal audit function and management's responses.

- Review and discuss the responsibilities, annual work plan and planned audit procedures, performance, budget and staffing of the Company's internal SOX audit function with the internal audit function, and, if appropriate, with the independent registered public accounting firm and/or any third party service provider providing internal SOX audit services to the Company. Discuss the annual work plan, planned audit procedures and testing results privately with internal audit, without management present, including to make inquiries regarding the independence of the SOX testing scope and findings.

61. In the same section, under the subsection "Review of Financial Information Presentation, Earnings Press Releases and Guidance," the Audit Committee Charter states that the Audit Committee will:

The Committee shall periodically discuss with management the Company's procedures with respect to the presentation of the Company's financial information (paying attention to any use of "pro forma" or "adjusted" non-GAAP information) and review earnings press releases, earnings guidance provided to analysts and rating agencies and financial information provided to the public, analysts and ratings agencies.

62. In the same section, under the subsection "Compliance with Laws," the Audit Committee Charter states that the Audit Committee will:

On at least an annual basis, the Committee shall review and discuss with management and the independent auditor (a) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Ethics, compliance with antibribery and anti-corruption laws and regulations, and compliance with export control regulations and (b) reports regarding compliance with applicable laws, regulations and internal compliance programs. The Committee must discuss with management

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and the independent auditor any correspondence with regulators or governmental agencies and any reports or complaints that raise material issues regarding the Company's financial statements or policies. The Committee must discuss with the Company's Chief Legal Officer any legal matters that may have a material impact on the financial statements or the Company's compliance procedures and internal controls.

63.     In the same section, under the subsection "Risk Management," the Audit Committee Charter states that the Audit Committee will:

a. oversee the Company's risk management functions with respect to all business activities and associated risks not required to be overseen by or reported to an independent committee of the Board, including the following categories of risk: Compliance/Regulatory/Consumer Protection (including Anti-Money Laundering and Fair Lending), Credit, Data Governance/Privacy, Financial, Fraud, Information Security, Legal, Model, Operational, Reputation, Strategic, Technology, and Third Party;

b. receive reports from the Company's risk management functions on a quarterly basis to help fulfill the Committee's duties to oversee the Company's principal risk exposures and mitigation efforts with respect to such risks, including: the Company's policies concerning risk assessment and risk management, risk assessment reports and related remediation plans, and reports on any other material risk matters; and

c. at least annually, ensure that a presentation is made to the Board regarding Enterprise Risk Management and the Company's response to key risks.

64.     In the same section, under the subsection "Report to Full Board," the Audit Committee Charter states that the Audit Committee will:

23

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The Committee must review with the full Board any issues that arise regarding: (a) the quality or integrity of the Company's financial statements; (b) the Company's compliance with legal or regulatory requirements; (c) the performance and independence of the Company's independent auditor; (d) the performance of the internal audit function; and (e) the performance of the Enterprise Risk Management function.

## SUBSTANTIVE ALLEGATIONS

65.    Founded in April 2012, Upstart constructed its unique AI software to accurately identify the creditworthiness of prospective loan borrowers and optimize the loan process for lenders and lendees.

66.    Upstart's AI models are allegedly able to better identify the true risk of a loan, which the Company refers to as "risk separation." The Company's AI software uses unconventional metrics to assess default risk such as where a potential borrower attended college, their GPA, their standardized test scores, and their work history, among other things, in addition to the traditional data sets such as FICO score and income.

67.    The Company's AI software is occasionally recalibrated to help improve the accuracy and automation of its approvals.

68.    Upstart partners with banks and credit unions to furnish personal and auto loans between $1,000 to $50,000. The annual percentage rates attached to these loans are generally between 6.5% to 35.99% over a three-to-seven-year period, with some variation.

69.    Upstart's business model largely relies on fees paid by banking partners. Upstart charges banks referral fees for each loan furnished through Upstart's website, "platform" fees based upon the quantity of loans referred, and loans servicing fees gathered from customers as they repay their loans.

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

70. The Company's revenue guidance for 2025 was announced as approximately $1 billion, including revenue from fees of approximately $920 million. The Company increased this guidance in 2025 to approximately $1.01 billion, while keeping revenue from fees steady at $920 million.

71. The Company launched its newest version of its AI model, Model 22, in early 2025. At the time Model 22 was launched, the Individual Defendants highlighted Model 22's accuracy rates, noting that it would increase loan approval rates and, as a result, boost the Company's revenue.

***False and Misleading Statements***

72. On May 14, 2025, Upstart held its first ever "AI Day" investor event.

73. In a presentation shown at AI Day, a slide represented that the Company's AI "***[m]odel accuracy drives more approvals***" and included images that show how the use of the model supposedly leads to higher approval rates that more traditional underwriting models.

74. That same day, the Company issued a press release in connection with the AI Day event, titled "Upstart Showcases AI Breakthroughs and Business Momentum at Inaugural 'AI Day'" (the "AI Day Press Release").

75. The AI day Press Release summarized the event:

> At the event, [Defendant] Girouard outlined the $1 trillion opportunity in credit and Upstart's leading role in delivering the AI that is changing how loans are underwritten, automated, and serviced. He also reiterated his four goals for 2025: 10X Upstart's advantage in AI; prepare Upstart's funding supply for ***rapid growth***; return to GAAP profitability in the second half of the year; and ***giant leaps toward best rates and best process for all.***
> Co-founder and [CTO Defendant] Gu walked investors through the company's journey in developing a vertically integrated AI model trained on over 90 million datapoints. ***Gu emphasized how***

25

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Upstart's use of advanced techniques*—such as proprietary loss functions, embeddings, and dynamic macro modeling—*delivers more accurate underwriting and faster approvals than traditional lenders.*

[CMO] and Senior Vice President of Growth [Defendant] Rapport detailed how *Upstart's winning business model—driven by industry-leading AI*, marketplace capital, and brand advantage—*is driving growth across the full credit spectrum*. She positioned Upstart as a "category of one" business that is reshaping borrower expectations with speed and ease.

[CFO Defendant] Datta showed how *Upstart's growth trajectory, pricing power, margins, operating leverage, and profits have created a unique financial profile that results in business model resilience.* He also pointed to potential future revenue streams for Upstart, including ratable fee revenue, subscriptions, revolving credit, and servicing for all.

76.    On August 5, 2025, the Company issued a press release to announce its financial results for the second quarter of 2025 (the "Q2 2025 Earnings Release"). The Q2 2025 Earnings Release revealed revenue guidance of approximately $280 million for the third quarter of 2025 and announced increased full year revenue guidance from approximately $1.01 billion to approximately $1.055 billion, including an increase to revenue from fees guidance from approximately $920 million up to $990 million.

77.    The Q2 2025 Earnings Release quoted Defendant Girouard, who touted the Company's supposed growth, stating:

A year ago, you saw the first signs that Upstart was returning to growth mode - and today you can see it in full bloom . . . . In addition to achieving triple digit revenue growth, we reached GAAP profitability a quarter sooner than expected and our newer businesses actually accelerated off their amazing growth in the first quarter.

26

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

78.    On August 5, 2025, the Company held an earnings call with investors and analysts to discuss the second quarter results (the "Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, Defendant Girouard revealed that the second quarter results were the result of Model 22, stating, in relevant part:

> Once again, our growth last quarter was not a result of dramatic macro improvements or Fed rate decreases . . . . ***Our growth was primarily on the back of model improvements, which helped to drive conversion rates from 19% in Q1 to 24% in Q2. These wins came first and foremost from Model 22, which we launched in early May.***

79.    Defendant Gu, during the Q2 2025 Earnings Call, highlighted Model 22's accuracy, and how the Company has been taking advantage of it, stating, in relevant part:

> Model 22 made use of neural networks at every level of the model architecture, whereas prior models only made use of neural networks in the base layer. That may sound like a subtlety, but it increased our separation accuracy advantage over our benchmark textbook credit model by 17 percentage points to 171.2%. Equivalently, it decreased the inaccuracy remaining to be solved to 87.5%.

> * * *

> As of the end of Q2, core underwriting had 91 million borrower repayment events to train on, up from 86 million at the end of the prior quarter.

80.    Defendant Datta further highlighted Model 22's supposed accuracy and its impact on the Company's growth prospects, stating, in relevant part:

> [T]ransactional revenue more than doubled year-on-year, ***largely reflecting the influence of the aforementioned Model 22.*** Separately, servicing fee revenue grew by nearly 20% year-on-

27

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

year as the outstanding book of serviced loans continued to expand.

\* \* \*

Our contribution margin, a non-GAAP metric, which we define as revenue from fees minus variable costs for borrower acquisition, verification and servicing as a percentage of revenue from fees came in at 58% in Q2, up 3 percentage points from the prior quarter and exceeding guidance. This improvement reflects a strengthening take rate in our core borrower segment in addition to the acquisition and operational unit cost efficiencies ***driven in part by Model 22***.

81.    During the question-and-answer portion of the Q2 2025 Earnings Call, an analyst asked about "the 2 elements of conversion rate, the approval rate and then kind of the acceptance rate" of the Company's loans, notably "how those ratios have maybe changed versus the prior year?" The analyst also asked if, "as we think about the new model," the Individual Defendants could "talk a little bit about the types of people or the profile of the people that may have been rejected before that they're being approved today." Defendant Gu responded, in relevant part:

I think the short answer is that like we've said a number of times at AI Day and other instances, ***the real power of our model comes from its ability to find many, many small subtle relationships in the data***, and that's happening at multiple levels of the model architecture as we described with Model 22.

And the unfortunate result of that is that it's not like there is one -- well, unfortunate for answering the question is that there's not really one simple answer of like we have suddenly got more high credit score borrowers or more low-income borrowers or anything like that. ***It really is just picking a couple of borrowers from many different sort of parts of the credit fabric, if you will, and then finding borrowers who are more likely to repay than their sort of conventional credit characteristics would suggest.***

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

82.     Also on August 5, 2025, the Company filed its quarterly report on Form 10-Q for the second quarter of 2025 (the "Q2 2025 10-Q"). The 2Q 2025 10-Q was signed by Defendants Girouard and Datta and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Girouard and Datta attesting to the accuracy of the 2Q 2025 10-Q and that "financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the" Company.

83.     The 2Q 2025 10-Q stated, in relevant part:

> ***Transaction Volume is driven by improvements in our AI models and technology***, including our ability to streamline and automate the loan application and origination process.

> Transaction Volume, Dollars increased 154% in the three months ended June 30, 2025 compared to the same period of 2024, and increased 121% in the six months ended June 30, 2025 compared to the same period of 2024. Transaction Volume, Number of Loans increased 159% and 133% in the three and six months ended June 30, 2025 compared to the same period of 2024, respectively. ***These increases were primarily due to [inter alia] model improvements . . . , which resulted in an increase in the number of qualified borrowers*** and more attractive loan offers. The increase in Transaction Volume, Number of Loans was higher than the increase in Transaction Volume, Dollars due to the decrease in average loan size, ***primarily as underwriting model improvements drove higher approval rates*** in smaller dollar categories of loans.

84.     Regarding the Company's AI model and how it has improved the Company's conversion rate, the Q2 2025 10-Q stated, in relevant part:

> Historically, our Conversion Rate has benefited from improvements to our technology, which have made our evaluation of risk more accurate and our verification process more

29

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

automated," and that the Company's "Conversion Rate increased to 23.9% and 21.7% in the three and six months ended June 30, 2025, respectively, from 15.2% and 14.6% in the same periods of 2024, primarily driven by [inter alia] underwriting model improvements[.]

85. The statements referenced above in ¶¶ 72-84 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading including, among other things, that: (1) Model 22 would overreact to negative macroeconomic flags in performing its risk-separation evaluation; (2) as a result, Model 22's accuracy and loan approval rate was overstated; (3) as a result of Model 22's conservative credit assessments, Upstart's revenue results were being negatively impacted; (4) therefore, the Company's revenue guidance for 2025 was unreliable; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## THE TRUTH EMERGES

86. The truth emerged November 4, 2025, after the market closed, when the Company issued a press release announcing its financial results for the third quarter of 2025 (the "Q3 2025 Earnings Release"). The Q3 2025 Earnings Release revealed that the Company had reported a third quarter revenue of only $277 million, missing the previous guidance of $280 million by approximately $2.62 million. The Q3 2025 Earnings Release also revealed the Company only expected fourth quarter revenue of $288 million, far below the consensus estimates of $303.7 million. The Company was also forced to reduce its revenue guidance for the full year from approximately $1.055 billion down to $1.035 billion, as well as expected

30

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

revenue from fee guidance from approximately $990 million down to approximately $946 million.

87. Later that same day, the Company held an earnings call with investors and analysts (the "Q3 2025 Earnings Call") to discuss the financial results. During the Q3 2025 Earnings Call, it was revealed that Model 22 had "overreact[ed]" to certain macroeconomic markers in the quarter, which caused lower borrower approval and conversion rates. Specifically, Defendant Girouard stated, in relevant part:

> **[T]ransaction volume on our platform was less than we anticipated.**
>
> **Our risk models responded to macroeconomic signals they observed by moderately reducing approvals and increasing interest rates. This drove a reduction in our conversion rate from 23.9% in Q2 to 20.6% in Q3.**
>
> If you follow the Upstart Macro Index, you would have seen that this macro indicator ticked up modestly in July and August, which is essentially what our model responses to over the course of a quarter. We believe this to be nothing more than a speed bump with UMI [Upstart Maco Index] reverting to lower numbers since.

88. Defendant Girouard further stated that "we see no material deterioration in consumer credit strength" …"[a]nd in fact, we've seen recent signs of improvement," before noting that the "[Model 22] system is behaving exactly as it was designed."

89. In response to an analyst's questions regarding "the strong demand in the third quarter," and also "the guidance, which was a little bit below what we were expecting and below the guidance in 2Q" and also "how do you square these 2

31

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

things together," Defendant Girouard represented that Model 22 had a tendency to "overreact[]" to macroeconomic factors:

> I think what it really highlights is that ***our model took a step towards conservatism during the third quarter, just based on seeing macro factors.***
>
> And I think that is just a natural thing we might expect. As we said, it's since reverted, but it was a period of time where it saw signals, and it was moving quickly.
>
> ***I think maybe overreacting.*** I think in some sense, ***having a model that overreacts is better than having ones that underreact because it did revert.***

90. In response to an analyst's question about Model 22's impact on the financial results, Defendant Gu stated that Model 22 had been "knowingly" calibrated to be "more conservative on the credit side in earlier parts of the quarter[,]" stating, in relevant part:

> So obviously, ***we did have a larger increase in applications relative to where the final originations count ended up.***
>
> So I think mechanically, you can infer from that change in the likelihood to convert through the funnel. ***Of course, the conversion rates are lower.***
>
> ***Now that's in large part . . . because we were knowingly making a choice with our model to be a little bit more conservative on the credit side in earlier parts of the quarter.***
>
> So relative to that model, of course, ***we did end up marketing to people who were a little less likely to be approved or a little less likely to convert***, but that's not necessarily a chosen strategy.

91. Another analyst asked about what factored into Model 22's conservative credit assessment, to which Defendant Girouard stated, in relevant part:

32

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> [R]eally, ***the conservatism in the model is, from our point of view, pretty much the dominant driver of the change in conversion rate.***
>
> So it comes in the form of a small fraction, fewer people approved, the rates they're approved at being a little bit higher, which means just marginally less likely to take that load, and then sometimes the approved loan size is a little smaller.
>
> So that is the basics of ***a slightly more conservative twist in the model. So again, we don't believe this is anything sustainable.*** And we do think that we'll get to a model that's a little less responsive, honestly, and maybe ***overresponsive in this particular case.***
>
> But no, there's no other factor going on, as you saw the application volume is quite strong.

92. During his remarks, Defendant Gu acknowledged Model 22 issues with being "overly responsive" to changes and "measurement error[s,]" noting that the Individual Defendants were working on updating the model:

> [T]he thing that I was referencing earlier in my prepared remarks about what happened this quarter and the improvements we've made that we expect to be durable and lasting with respect to reducing variance on this metric ***specifically has to do with managing how the model responds to the latest signals in macro***.
>
> So over the last few years, one of the things that we invested the most heavily in was building our models in such a way that we think they are the fastest, most precise at responding to the latest patterns in borrower repayment, including at the macro level.
>
> So if it's like federal employees or if it's like service sector workers or if it's high primness borrowers or low primness borrowers that are being impacted, or it's everybody being impacted by a big macro event, we want our models to be the very fastest at responding and respond as precisely as the data allows.

33

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

And so we've made a ton of progress towards that. We're very proud of the sort of system we've designed and built.

***But one of the side effects of that system is that it can be a little overly responsive to the latest changes. And that, in addition to being responsive, there's always some kind of sampling and measurement error.***

You can think about what we have, of course, a large amount of data, but relative to all people in the U.S. or the whole economy, it's still a relatively small sample.

***So there's a natural statistical sampling error that comes about from that. And we were doing a lot of work this quarter on understanding how much natural error there is in the match between the sample and the actual levels of calibration.***

***Then we devised some techniques to be able to shrink that measurement error by about half, so that we don't have as much what I call unwanted variance in this metric.***

***We really just want the model to respond to real changes as opposed to changes that are just measurement error, and we were able to reduce that measurement error by a very significant amount this quarter,*** which means that ***in future periods, we expect that . . . we will see less volatility in our conversion rates as affected by macro.***

93.    Defendant Datta, in response to one analyst's point that "it sounds like you're assuming that the conservatism in the model is going to continue in the fourth quarter, despite your comments around the UMI actually starting to show some signs of improvement. Is that correct?", stated that "some amount of Q4 was impacted by that UMI rise as well" and that "the model impact in Q3, even though it appears to be abating, will impact Q4 as well."

94.    On this news, the price of the Company's stock fell $4.49 per share, or approximately 9.7%, from a close of $46.24 per share on November 4, 2025, to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

close at $41.75 per share on November 5, 2025.

## DAMAGES TO UPSTART

95. As a direct and proximate result of the Individual Defendants' misconduct, Upstart has expended and will continue to expend significant sums of money.

96. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

97. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

98. Such expenditures also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

99. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

100. As a direct and proximate result of the Individual Defendants' conduct, Upstart has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" which will plague the Company's share price

35

going forward.

## INSIDER TRADING

101. During the Relevant Period, while the Company's stock price was artificially inflated and before the truth was exposed, Defendant Girouard sold 208,335 shares of Upstart on inside information, for which he received approximately $13.5 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in this scheme.

102. During the Relevant Period, while the Company's stock price was artificially inflated and before the truth was exposed, Defendant Gu sold 5,000 shares of Upstart stock on inside information, for which he received approximately $343,059 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in this scheme.

103. During the Relevant Period, while the Company's stock price was artificially inflated and before the truth was exposed, Defendant Datta sold 26,985 shares of Upstart stock on inside information, for which he received approximately $1.5 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in this scheme.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104. Plaintiff incorporates by reference and realleges each and every allegation stated above as if set forth fully herein.

36

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

105.    Plaintiff brings this action derivatively in the right of and for the benefit of Upstart to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws.

106.    Upstart is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

107.    Plaintiff, and has been at all relevant times, a shareholder of Upstart. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

108.    A pre-suit demand on the Board is futile and, therefore, excused. At the time this action was filed, Upstart's Board consisted of the eight individuals: Defendants Girouard, Gu, Bernard, Cooper, Hentges, O'Kelly, and Terry (the "Director-Defendants") and non-party Tim Wennes. Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was filed.

109.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

110.    The Director-Defendants, in violation of their fiduciary duties, either

37

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

knowingly or recklessly caused or permitted Upstart to issue materially false and misleading statements intended to make Upstart appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

111.   Demand is futile as to Defendant Girouard. Defendant Girouard co-founded the Company, served as CEO from 2012 until May 1, 2026, and has served as a Company director and Executive Chairman since 2012. The Company provides Defendant Girouard with his principal occupation for which he receives significant compensation. As the Company admits, he is not an independent director. As former CEO, Defendant Girouard conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct and/or personally made the false and misleading statements alleged herein and signed the materially false and misleading Q2 2025 10-Q. Defendant Girouard's insider sales, made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in furthering the scheme. Defendant Girouard is also named as a defendant in the Securities Class Action. For these reasons, too, Defendant Girouard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Demand upon Defendant Girouard is futile and, therefore, excused.

112.   Demand on Defendant Gu is futile. Defendant Gu co-founded the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Upstart and has served as a Company director since 2015. Defendant Gu has previously served in various roles at the Company since 2012, including CTO, and currently serves as the Company's CEO. The Company provides Defendant Gu with his principal occupation for which he receives significant compensation. As the Company admits, he is not an independent director. As CEO, Defendant Gu conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Gu's insider sales, made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in furthering the scheme. Defendant Gu is also named as a defendant in the Securities Class Action. For these reasons, too, Defendant Gu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Demand upon Defendant Gu is futile and, therefore, excused.

113.    Demand on Defendant Bernard is futile. Defendant Bernard has served as a Company director since February 2025 and also serves as a member of the Nominating & Corporate Governance Committee and the Compensation Committee. The Company provides Defendant Bernard with significant compensation for his role as a director. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded

39

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

his duties to protect corporate assets. For these reasons, too, Defendant Bernard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Demand upon Defendant Bernard is futile and, therefore, excused.

114. Demand on Defendant Cooper is futile. Defendant Cooper has served as a Company director since 2021 and serves as the Lead Independent Director and the Chair of the Compensation Committee. The Company provides Defendant Cooper with significant compensation for her role as a director. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Cooper breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Demand upon Defendant Cooper is futile and, therefore, excused.

115. Demand on Defendant Hentges is futile. Defendant Hentges has served as a Company director since 2019 and also serves as a member of the Audit Committee. The Company provides Defendant Hentges with significant compensation for her role as a director. As a trusted director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Hentges breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Demand upon Defendant Hentges is futile and, therefore, excused.

40

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

116.    Demand on Defendant O'Kelly is futile. Defendant O'Kelly has served as a Company director since 2018 and also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. The Company provides Defendant O'Kelly with signficant compensation for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant O'Kelly breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Demand upon Defendant O'Kelly is futile, and, therefore, excused.

117.    Demand on Defendant Terry is futile. Defendant Terry has served as a Company director since 2019 and also serves as the Chair of the Audit Committee. The Company provides Defendant Terry with significant compensation for his role as a director. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Terry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Demand upon Defendant Terry is futile and, therefore, excused.

118.    Additionally, Defendants Terry (as Chair), Hentges, and O'Kelly served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, the Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and facilitating the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. The Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

119. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

120. Upstart has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

wrongful conduct to attempt to recover any part of the damages Upstart suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

121.   The acts complained of herein constitute violations of fiduciary duties owed by Upstarts's officers and directors, and these acts are incapable of ratification.

122.   The Director-Defendants' conduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

123.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Upstart. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers

43

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of Upstart, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit and demand on the Director-Defendants is futile and, therefore, excused.

124. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Upstart to sue the Individual Defendants since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

125. For the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIM I
### *Against the Individual Defendants for Breach of Fiduciary Duties*

126. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Upstart's business and affairs.

128. Each Individual Defendant intentionally or recklessly violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

129. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.

130. The Individual Defendants, in breach of their fiduciary duties, willfully or recklessly made and/or caused the Company to make false and misleading

44
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) in performing its risk-separation evaluation, Model 22 would overreact to negative macroeconomic flags; (2) as a result, Model 22's accuracy and loan approval rate was overstated; (3) the Company's revenue results were being negatively impacted as a result of the Model 22's conservative credit assessments; (4) therefore, the Company's revenue guidance for 2025 was unreliable; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

131. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

132. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

133. Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein.

134. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations, or the Individual Defendants acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly

45

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and for the purpose and effect of artificially inflating the price of Upstart's securities.

135. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the scheme set forth herein and to fail to maintain internal controls, or the Individual Defendants acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Upstart's securities.

136. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur. In other words, these actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

137. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Upstart has sustained and will continue to sustain significant damages.

138. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

139. Plaintiff, on behalf of Upstart, has no adequate remedy at law.

## CLAIM II

### *Against the Individual Defendants for Unjust Enrichment*

140. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

46

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

141. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Upstart. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Upstart that was tied to the performance or artificially inflated valuation of Upstart, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct, including lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

142. Plaintiff, as a shareholder and a representative of Upstart, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

143. Plaintiff, on behalf of Upstart, has no adequate remedy at law.

## CLAIM III

### *Against the Individual Defendants for Abuse of Control*

144. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Upstart, for which they are legally responsible.

47

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

146.    As a direct and proximate result of the Individual Defendants' abuse of control, Upstart has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

147.    Plaintiff, on behalf of Upstart, has no adequate remedy at law.

## CLAIM IV

### *Against the Individual Defendants for Gross Mismanagement*

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

149.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Upstart in a manner consistent with the operations of a publicly held corporation.

150.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Upstart has sustained and will continue to sustain significant damages.

151.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

152.    Plaintiff, on behalf of Upstart, has no adequate remedy at law.

## CLAIM V

### *Against Individual Defendants for Waste of Corporate Assets*

153.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

154. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

155. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Upstart to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

156. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

157. Plaintiff, on behalf of Upstart, has no adequate remedy at law.

## CLAIM VI

*Against Defendants Girouard, Datta, Gu, and Rapport for Contribution Under Sections 10(b) and 21D of the Exchange Act*

158. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

159. Upstart and Defendants Girouard, Datta, Gu, and Rapport are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

160. If and when the Company is found liable in the Securities Class Action, the Company's liability will be in whole or in part due to Defendant Girouard's, Defendant Datta's, Defendant Gu's, and Defendant Rapports's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

161. Defendants Girouard, Datta, Gu, and Rapport, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

162. Accordingly, Defendants Girouard, Datta, Gu, and Rapport are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

163. As such, Upstart is entitled to receive all appropriate contribution or indemnification from Defendants Girouard, Datta, Gu, and Rapport.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in Upstart's favor against all Individual Defendants as follows:

A. Declaring that Plaintiff is an adequate representative of the Company and may maintain this action on behalf of Upstart;

B. Declaring that demand is excused as futile;

C. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of fiduciary duties to Upstart;

D. Awarding to Upstart the damages sustained by it as a result of the violations set forth herein from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

E. Directing Upstart to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 18, 2026          Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff Yunfeng Zou*

51

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Yunfeng Zou am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. 6/17/2026

Signed by:

*Yunfeng Zou*

B4809E59FA4F4B8...

Yunfeng Zou